IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

RAY L. FAYSON,

      Plaintiff,

v.                                     CASE NO. 1:15-cv-13-MP-GRJ

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Acting Commissioner of Social

Security ("the Commissioner") denying his application for disability benefits under Title II

of the Social Security Act. (ECF No. 1). The Commissioner has answered, ECF No. 9,

and both parties have filed briefs outlining their respective positions. (ECF Nos. 15, 16.)

For the reasons discussed below, the Commissioner's decision is due to be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed his application for disability insurance benefits on June 29, 2011,

alleging a disability onset date of March 15, 2011, due to acute diastolic heart failure.

(R. 160–163.) Plaintiff was born on November 4, 1971 and previously worked as a

driver, cashier, warehouse laborer, central supply tech, construction worker, pre cast

molder, labor gang supervisor, fiber glass boat finisher, and carpet layer helper. (R. 19.)

Plaintiff's applications were denied initially and upon reconsideration. (R. 78–84,

86–94, 98–102, 105–109.) An administrative law judge (ALJ) conducted a hearing on

May 17, 2013. (R. 10–51.) The ALJ found that Plaintiff had the following severe

impairments: cardiomyopathy, hypertension, mild, chronic, renal insufficiency, and ICD

(implantable cardioverter defibrillator implantation. (R. 15.) However, the ALJ found that

Plaintiff was not disabled under the Social Security Act from March 15, 2011, through

the date of his unfavorable decision, August 2, 2013. (R. 20.) The Appeals Council

denied Plaintiff's request for review on December 7, 2014. (R. 1–4.) Plaintiff then filed

the instant Complaint on January 29, 2015. (ECF No. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence is more than a scintilla,

i.e., the evidence must do more than merely create a suspicion of the existence of a

fact, and must include such relevant evidence as a reasonable person would accept as

adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.

1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.

Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord Edwards

v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932

F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67

F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding

that the court must scrutinize the entire record to determine reasonableness of factual

findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20
C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing
past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's
impairments (considering his residual functional capacity ("RFC"), age, education, and
past work) prevent him from doing other work that exists in the national economy, then
he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant
work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir.
1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden
then temporarily shifts to the Commissioner to demonstrate that "other work" which the
claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at
1278 n.2.[2] The Commissioner may satisfy this burden by pointing to the Medical-
Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is
disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play
once the burden has shifted to the Commissioner to show that the claimant can perform
other work.").

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the
> Commissioner. The Commissioner must produce evidence that
> there is other work available in significant numbers in the
> national economy that the claimant has the capacity to
> perform. In order to be considered disabled, the claimant must
> then prove that he is unable to perform the jobs that the
> Commissioner lists. The temporary shifting of the burden to the
> Commissioner was initiated by the courts, and is not
> specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion." *Wolfe v. Chater*, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation."). In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment. *Walker*, 826 F.2d at 1003.

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform. *Wolfe*, 86 F.3d at 1077–78. Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence. *See id.* Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner. *Hale v. Bowen,* 831 F.2d 1007, 1011 (11th Cir. 1987).

## III.  SUMMARY OF THE RECORD

### A.    Medical Evidence

On March 15, 2011, Plaintiff presented to the emergency room at North Florida Regional Medical Center reporting shortness of breath, and was diagnosed with decompensated congestive heart failure systolic, acute-on-chronic, with a secondary diagnosis of nonischemic cardiomyopathy, ejection fraction approximately 30% and

malignant hypertension. (R. 237.) Plaintiff's blood pressure was recorded as 163/103 and a lung examination showed crackles at the bases. (R. 237.) A chest x-ray showed cardiomagaly with pulmonary vascular congestion and Plaintiff was treated with diuretics and his cardiac medications were optimized. (*Id.*) He responded well to the treatment, stabilized, and was discharged the following day. (*Id.*)

At Plaintiff's two-week follow up visit he denied any chest pain or shortness of breath since his last office visit, but noted that his fatigue had increased. (R. 333.) Plaintiff reported that he believed his issues were related to his job duties and that he was considering finding another position with his employer which was less vigorous. (*Id.*) Dr. Dillon agreed that Plaintiff's increased fatigue was related to his current medical condition and possibly aggravated by the increased workload Plaintiff reported at his job. (R. 334.) A physical examination revealed a regular cardiac rate and rhythm without ectopy, murmurs, rubs, clicks, or gallops. (R. 333.)

On May 6, 2011, Plaintiff had a follow up visit for his cardiomyopathy and hypertension with Michael Dillon, M.D. (R. 311–12.) Dr. Dillon noted that Plaintiff continues to not feel well, has dizziness and low energy, and his arms tire out quickly. (*Id.*) Plaintiff reported that he was let go from work because they could not give him a job that required lower exercise. Dr. Dillon reported fluctuating blood pressure, usually 130–140, but at times up to 160. (*Id.*) On examination, Plaintiff's blood pressure was 110/60 and his pulse was 62 and regular. (*Id.*) Plaintiff's cardiac examination revealed a regular rate and rhythm without ectopy, murmurs, or gallops. (*Id.*) However, there were trace peripheral edema. (*Id.*) Dr. Dillon noted that Plaintiff "has progressive limitations and I think he will be permanently disabled." (*Id.*) Nonetheless Dr. Dillon encouraged

Plaintiff to do some regular walking to see if he could increase his stamina and opined that some of his shortness of breath is due to deconditioning. (*Id.*) Dr. Dillon said that Plaintiff would get a Holter monitor because of the dizziness and wanted to get the Holter monitor results before making a final decision as to the issue of a defibrillator. (R. 312.)

On June 15, 2011, Plaintiff again presented to the emergency room at North Florida Regional Medical Center reporting lower extremity pain and swelling as his chief complaint. (R. 226–34.) Plaintiff reported no chest pain or difficulty breathing. (R. 229.) An examination revealed that Plaintiff's breath sounded normal and a chest x-ray revealed a normal cardiac silhouette. (R. 229–30.) Plaintiff was discharged the same day in good condition. (R. 235.) Later that month, Plaintiff had a sleep study performed, which revealed that his previously documented sleep apnea was eliminated by the use of a nasal CPAP. (R. 268.)

Plaintiff had another follow up visit with Dr. Dillon on September 21, 2011 for his nonischemic cardiomyopathy and hypertension. (R. 328.) Plaintiff reported that he had done "fair" since his last visit and felt that his CPAP mask for sleep apnea had helped his energy, noting that he was not falling asleep in the middle of the day like he would previously. (*Id.*) Dr. Dillon reported that the Holter monitor "looked great with almost no ectopy and nothing to account for presyncope." (*Id.*) At the follow up, Plaintiff's blood pressure was 100/60 and a cardiac examination revealed a regular rate and rhythm without ectopy, rubs, murmurs, or gallops. (*Id.*) Dr. Dillon reported the following ongoing problems: severe nonischemic cardiomyopathy, ejection fraction since 2006 has ranged between 15 and 50% with the most recent showing 30–35%; normal coronary arteries;

and severe hypertension, non renovascular. (*Id.*)

At Plaintiff's January 4, 2012 follow up visit with Dr. Dillon, Plaintiff reported feeling pretty good with no active complaints and informed Dr. Dillon that he decided to proceed with having a pacemaker implanted. (R. 363.) A physical examination revealed a 168/100 blood pressure and a cardiovascular exam revealed a regular rate and rhythm with a normal S1 and S2, and no murmurs, rubs, gallops, or bruits. (*Id.*) Plaintiff eventually had the pacemaker implanted on January 26, 2012. (R. 389.)

On June 5, 2012, Plaintiff saw Dr. Dillon for another follow up, reporting that "he has done okay," but "still gets tired fairly readily and has difficulty staying out in the heat for any length of time." (R. 403.) Plaintiff stated that he walks to a park near his house but is pretty tired when he gets back. Additionally, standing up and washing dishes is difficult for him but that he is able to do some housework. (*Id.*) Plaintiff reported no chest pain and was not aware of any palpitations or irregular heartbeats. (*Id.*) A physical examination revealed a blood pressure of 130/78 and a cardiac examination revealed a regular rate and rhythm without ectopy, murmurs, gallops, rubs, or peripheral edema. (R. 404.) Dr. Dillon noted the following on-going problems: severe, non-ischemic cardiomyopathy with an ejection fraction of 30–35%; normal coronary arteries; severe non-renovascular hypertension; mild chronic renal insufficiency; dual-chamber ICD implantation; and a history of asthma. (*Id.*) Dr. Dillon stated that Plaintiff "seems to be holding his own but has not significantly improved." (*Id.*)

At another follow up visit with Dr. Dillon on March 13, 2013, Plaintiff reported that he has overall "done fairly well," although he "still gets short of breath a few tries to walk too fast but with normal activity does reasonably well." (R. 412.) Plaintiff reported

stiffness and soreness in his thighs when he attempts to get up from sitting down. (*Id.*) Plaintiff's blood pressure was 152/100 and appeared to be in no acute distress. (R. 413.) A cardiac examination revealed no murmurs, rubs, gallops, clicks, or edema. (*Id.*) Dr. Dillon noted that Plaintiff "seems to be doing better than when I usually see him," but that Plaintiff's blood pressure was high and required a readjustment of his medication. (*Id.*) Additionally, Dr. Dillon noted that Plaintiff did not seem to have as much shortness of breath. (*Id.*) In terms of Plaintiff's leg discomfort, Dr. Dillon instructed Plaintiff to hold off on taking his simbastatin medication for 4 weeks and that if his symptoms did not improve to restart the medication. (*Id.*)

On April 20, 2013, Plaintiff presented to the emergency department at Shands Hospital reporting that he passed out earlier than morning. (R. 460.) Plaintiff's blood pressure was 143/95 and a cardiac examination revealed no murmurs, rubs, or gallops. (R. 462.) Plaintiff's potassium level was noted as 2.8. (R. 463.) Plaintiff was discharged in stable condition with a diagnosis of syncope. (R. 464.) At his follow up visit with Dr. Dillon on May 9, 2013, Plaintiff informed Dr. Dillon of his fainting episode. (R. 419.) Since that one episode Plaintiff had not had any other fainting episodes and reported that his breathing had been ok. (*Id.*) At the follow up, Plaintiff's blood pressure was high at 152/98, but Plaintiff did not appear to be in acute distress. (R. 420.) Dr. Dillon noted that he checked Plaintiff's pacemaker, which did not appear to be checked in the hospital, and learned that Plaintiff had an episode of supraventricular tachycardia the night he passed out. Dr. Dillon suspected it was caused by the low potassium. (R. 421.) Dr. Dillon adjusted Plaintiff's blood pressure medication and advised Plaintiff to follow up in 3 months. (R. 422.)

**B.     Opinion Evidence**

On January 26, 2012, Edmund Molis, M.D., a consultant for Disability Determination Services, reviewed Plaintiff's medical evidence and concluded that Plaintiff could perform a reduced range of light work. (R. 93.) Accordingly, Dr. Molis determined that Plaintiff was not disabled. (*Id.*)

**C.     Hearing Testimony**

Plaintiff's most recent job was at Shands Hospital as a stock tech. He stopped working at Shands in March 2011, initially due to fatigue, high blood pressure, and an enlarged heart. Plaintiff testified that he could only walk about half of his yard at home before he would get overheated and feel like he was about to faint. The last time he fainted was April 20, 2013, but that it had been a while since the last time that he fainted before that.

Plaintiff stated that he could get a gallon of milk out of the refrigerator and pour the milk into a glass and that he could stand on his feet for approximately 30 minutes before his legs started aching and his legs and feet started tingling. Further, Plaintiff said that he can bend over at the waist and get a piece of paper out of the bottom drawer of a file cabinet. Plaintiff can sit in a chair for approximately 35 to 45 minutes before his legs and feet feel like they are falling asleep.

Plaintiff lives in a house with his wife and two daughters and spends his day "up and down, walking around," and doing whatever he can to help out, such as straightening something up in the house. Plaintiff helps get his daughters ready for school, but has a hard time sweeping, vacuuming, and mopping due to his weakness. (R. 25–51.)

**D.     The ALJ's Findings**

The ALJ found that Plaintiff has the severe impairments of cardiomyopathy, hypertension, mild, chronic, renal insufficiency, and ICD (implantable cardioverter defibrillator implantation.) (R. 15.) The ALJ noted that Plaintiff is obese based on his body mass index and that he has considered Plaintiff's obesity but determined that there is no evidence that Plaintiff's obesity has significantly interfered with his work or activities of daily living. (*Id.*) At step three of the evaluation, the ALJ found that there was no evidence to support a finding that Plaintiff has an impairment, either singly or in combination, that meets or medically equals any listed impairment in 20 CFR Part 404, Supbart P, Appendix 1. (R. 15–16.) The ALJ noted that neither Plaintiff, nor his representative, alleged such either. (R. 16.)

The ALJ further found that Plaintiff has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a). (*Id.*) In his findings, the ALJ noted that although Dr. Dillon wrote on May 6, 2011, that Plaintiff's ailments were worsening and that Plaintiff could be permanently disabled, no weight was given to that opinion "because it is contrary to the treatment records, which show normal cardiac exams and normal functioning with normal activities. (R. 18.) Further, the ALJ accorded some weight to Dr. Molis's January 26, 2012 review, "because it is consistent with the treatment records, which show that the claimant has few limitations and is able to work." (*Id.*) The ALJ also noted that Plaintiff did not explain the discrepancy between his testimony regarding his alleged fainting episodes and the medical documentation of only one fainting episode. (*Id.*)

# IV. DISCUSSION

Plaintiff argues that the ALJ erred at step three by not finding that he met the requirements of Listing 4.02 due to his decompensated congestive heart failure, systolic, acute and chronic with a secondary diagnosis of nonischemic cardiomyopathy with an ejection fraction of approximately 30%, and malignant hypertension. (ECF No. 15 at 1.) Plaintiff also argues that the ALJ erred by violating the treating physician rule. (*Id.*) Based upon a careful review of the record the Court concludes that Plaintiff has failed to show that he meets or equals all of the criteria of Listing 4.02. Additionally, the Court concludes that the ALJ had good cause to disregard the treating physician's opinion.

The Court will first address Plaintiff's argument that the ALJ erred at step three by failing to find that the Plaintiff met Listing 4.02. Under step three of the sequential evaluation, a claimant who meets or equals a listing is entitled to disability benefits. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984). "To 'meet' a Listing, however, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citing 20 C.F.R. § 404.1525(a)–(d)). "To 'equal' a Listing, the medical findings must be 'at least equal in severity and duration to the listed findings.'" *Id.* (quoting 20 C.F.R. § 404.1526(a)). The claimant has the burden of proving that his impairments meet or equal a listed impairment by presenting specific medical signs, symptoms, or laboratory tests that meet all of the specified criteria. *Curry v. Astrue*, 650 F. Supp. 2d 1169, 1176 (N.D. Fla. 2009) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

Listing 4.02 for chronic heart failure requires that the claimant's impairment

"satisfy the requirements of one of the criteria in A *and* one of the criteria in B." 20

C.F.R. Part 404, Subpt. P, App.1, § 4.02 (emphasis added). Section 4.02 states in

relevant part:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B. Resulting in one of the following:
>
> 1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
>
> 2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or
>
> 3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:
>> a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

The ALJ's conclusion that Plaintiff does not meet the requirements of any listed impairments is supported by substantial evidence. Notably, the ALJ pointed out in his written decision that "[n]either the claimant, nor his representative, alleged that the claimant has an impairment, either singly or in combination, that meets or medically equals any listed impairment," but regardless, that the ALJ "finds no evidence to support such a finding." (R. 16.)

Plaintiff argues that under step three of the analysis, "[t]he substantial evidence in this matter shows that plaintiff Fayson has listing level heart failure." (ECF No. 15 at 20.) Plaintiff's argument rests on the March 16, 2011 medical records, which diagnose Plaintiff with "decompensated heart failure systolic, acute and chronic with secondary diagnoses of nonischemic cardiomyopathy, ejection fraction approximately 30% and malignant hypertension." (*Id.* at 20–21.) However, as Defendants assert, "[a]lthough the ALJ found [at step two] that Plaintiff's severe impairments included cardiomyopathy, hypertension, mild, chronic, renal insufficiency, and ICD (implantable cardioverter defibrillator) implantation, Plaintiff fails to show [under step three] that he meets or equals all the criteria of Listing 4.02." (ECF No. 16.)

Although the ALJ did not explicitly state in his opinion which listed impairment Plaintiff's condition might fall within, this alone does not warrant a finding that the ALJ

erred. *See Hutchinson v. Bowen*, 787 R.2d 1461, 1463 (11th Cir. 1986) (the ALJ need

not recite the fact that a claimant does not meet a listing, as such may be implied from

the record); *Curry*, 650 F. Supp. at 1177–78 (noting that the ALJ did not identify which

listing was under consideration, but holding that the claimant did not meet his burden in

proving that his conditions met a listing at step three). At step three of the analysis the

burden of proof remains on the claimant to provide evidence that his impairment meets

all of the criteria in the pertinent regulation listing. *Carpenter v. Comm'r of Soc. Sec.,*

614 F. App'x 482, 487 (11th Cir. 2015). As the ALJ pointed out, during the relevant

proceedings, neither Plaintiff nor his representative even brought up the idea that

Plaintiff might meet one of the listed impairments under step three. Further, Plaintiff's

memorandum of law fails to explain how, or point to any specific evidence suggesting

that Plaintiff satisfies the Section B criteria of Listing 4.02. Thus, Plaintiff has not met

his burden of proof.

Moreover, an independent review of Plaintiff's medical records disclose that

Plaintiff does not meet all of the requirements under Listing 4.02. Defendant concedes,

and the Court agrees, that Plaintiff likely meets the criteria under section 4.02(A)(1)

because there is medical evidence that Plaintiff has medically documented presence of

systolic failure based on Plaintiff's congestive heart failure with an ejection fraction of 30

percent to 35 percent. (R. 237, 328, 404.); § 4.02(A)(1) ("Systolic failure . . . with left

ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30

percent or less during a period of stability (not during an episode of acute heart

failure)"). The problem is that Plaintiff does not meet any of the criteria under section

4.02(B).

Section 4.02(B)(1) requires,

> [p]ersistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual . . . .

Plaintiff's medical records provide evidence to the contrary. The progress records disclose that Plaintiff told Dr. Dillon that he wanted to find another position—as opposed to stop working completely—with his employer that was less vigorous due to his medical issues. (R. 333.) Plaintiff admitted that he frequently walks to a park near his house, helps out with housework, and helps get his two young daughters ready for school. (R. 47–48, 403.) Further, Dr. Dillon opined that some of Plaintiff's shortness of breath was due to deconditioning and encouraged Plaintiff to engage in regular walking. (R. 311–12.) Dr. Dillon also noted that Plaintiff does reasonably well with normal activity. (R. 412.)

Although Plaintiff claims that he has difficulty performing tasks such as sweeping, vacuuming, and standing for periods longer than 30 minutes, Plaintiff's medical records—and notably Dr. Dillon's opinions— do not suggest that Plaintiff's medical problems "very seriously limit the ability to independently initiate, sustain, or complete activities of daily living." § 4.02(B)(1).

Additionally, nothing in the record suggests that any medical professionals have "concluded that the performance of an exercise test would present a significant risk to the individual." *Id.* As such, Plaintiff has failed to meet his burden of proving that he meets the section 4.02(B)(1) criteria.

Plaintiff also has failed to demonstrate that he meets the section 4.02(B)(2)

criteria. This subsection requires,

> [t]hree or more separate episodes of acute congestive heart failure within
> a consecutive 12–month period . . . with evidence of fluid retention . . .
> from clinical and imaging assessments at the time of the episodes,
> requiring acute extended physician intervention such as hospitalization or
> emergency room treatment for 12 hours or more, separated by periods of
> stabilization . . . .

As Defendants correctly point out, the record in this case simply fails to support a

finding that Plaintiff meets this criteria. The only documented evidence of an episode of

congestive heart failure is the one episode on March 15, 2011. ( R. 237.) The record

fails to provide evidence of two other episodes within a 12-month period of his March

15, 2011 episode, or any other episodes. Consequently, Plaintiff has also failed to meet

his burden of proving that he meets the section 4.02(B)(2) criteria.

Lastly, Plaintiff has failed to prove that he meets the criteria of the last

subsection of section B, section 4.02(B)(3). This subsection requires,

> [i]nability to perform on an exercise tolerance test at a workload equivalent
> to 5 METs or less due to:
>   a. Dyspnea, fatigue, palpitations, or chest discomfort; or
>   b. Three or more consecutive premature ventricular contractions
> (ventricular tachycardia), or increasing frequency of ventricular ectopy with
> at least 6 premature ventricular contractions per minute; or
>   c. Decrease of 10 mm Hg or more in systolic pressure below the
> baseline systolic blood pressure or the preceding systolic pressure
> measured during exercise . . . due to left ventricular dysfunction, despite
> an increase in workload; or
>   d. Signs attributable to inadequate cerebral perfusion, such as
> ataxic gait or mental confusion.

A review of Plaintiff's medical record wholly fails to present support for a finding that

Plaintiff meets any of the requirements under section 4.02(B)(3). Plaintiff also fails to

offer any suggestion as to how the evidence would equal these requirements.

Accordingly, because Listing 4.02 requires at least one of the section A and one of the

section B criteria to be present for a claimant to be deemed disabled, and  because

Plaintiff does not meet any of the criteria under section B, Plaintiff has failed to show

that he is disabled under step three of the analysis.

Furthermore, contrary to Plaintiff's contention, the ALJ gave Dr. Dillon's opinion

the proper weight in determining whether Plaintiff is disabled. An ALJ may disregard a

treating physician's opinion in a social security disability proceeding as long as there is

good cause and the ALJ clearly articulates the reasons for doing so. *Winschel v.*

*Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "Good cause exists 'when

the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence

supported a contrary finding; or (3) treating physician's opinion was conclusory or

inconsistent with the doctor's own medical records.'" *Id.* (quoting *Phillips v. Barnhart*,

357 F.3d 1232, 1241 (11th Cir. 2004)). The Eleventh Circuit has found "good cause" to

exist where the doctor's opinion was not bolstered by the evidence and was merely

conclusory. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987); *see also Winschel*,

631 F.3d at 1179 (an ALJ does not give a treating physician's medical opinion

considerable weight when the ALJ only references the treating physician once, merely

noting that the claimant saw the doctor monthly); *Vuxta v. Comm'r of Soc. Sec.*, 194 F.

App'x 874, 877 (11th Cir. 2006) (good cause existed where the treating physician

initially assessed the claimant as being extremely limited but his later medical records

indicated significant improvement with treatment); *Phillips*, 357 F.3d at 1241 (an ALJ

does not need to give a treating physician's opinion considerable weight where

evidence of the claimant's daily activities contradict the opinion); *Edwards v. Sullivan*,

937 F.2d 580, 583–84 (11th Cir. 1991) (good cause exists where a stated restriction

contains no clinical data to support the opinion as to restricted work, where clinical permission to return to work does not impose any limitation on the number of hours worked, and where the doctor conceded he was not sure he could objectively assess the claimant's condition).

Plaintiff argues that the ALJ erred in failing to give Dr. Dillon's opinion substantial weight in determining whether Plaintiff is disabled, pointing to Dr. Dillon's May 6, 2011 letter, in which Dr. Dillon opines "Mr. Fayson has progressive limitations and I think he will be permanently disabled." (*Id.* at 21–22.) Dr. Dillon's conclusory opinion regarding Plaintiff's potential future permanent disability is contrary to the treatment records.

Although Dr. Dillon opined on May 6, 2011, that Plaintiff will likely be permanently disabled, that same day Plaintiff's blood pressure was 110/60, his pulse was 62 and regular, and his cardiac examination revealed a regular rate and rhythm without ectopy, murmurs, or gallops. (R. 311–12.) Additionally, during that same visit Dr. Dillon encouraged Plaintiff to do some regular walking to increase his stamina and help with his shortness of breath and Plaintiff had a normal cardiac exam with normal functioning and normal activities. (R. 312.) Further, tests performed on June 15, 2011 also showed that Plaintiff had a normal cardiac silhouette. (R. 229–30.) On September 21, 2011, Plaintiff's blood pressure was 100/60 and a cardiac examination revealed a regular rate and rhythm without ectopy, rubs, murmurs, or gallops. (R. 328.) On January 4, 2012, a cardiovascular exam revealed a regular rate and rhythm with a normal S1 and S2, and no murmurs, rubs, gallops, or bruits. (R. 363.) On June 5, 2012, Plaintiff reported no chest pain and informed doctors that he was not aware of any palpitations or irregular heartbeats, and a physical examination revealed a blood pressure of 130/78

and a cardiac examination revealed a regular rate and rhythm without ectopy, murmurs, gallops, rubs, or peripheral edema. (R. 403–04.) On March 13, 2013, although Plaintiff's blood pressure was a little high at 152/100, Dr. Dillon noted that Plaintiff appeared to be in no acute distress and a cardiac examination revealed no murmurs, rubs, gallops, clicks, or edema. (R. 413.) Significantly, Dr. Dillon noted that Plaintiff appeared to be doing better than when he usually sees him and adjusted Plaintiff's blood pressure medication. (R. 412.)

Then, on April 20, 2013 after Plaintiff passed out—which Dr. Dillon later opined was due to low potassium—Plaintiff had another normal cardiac exam that revealed no murmurs, rubs, or gallops. (R. 462–63.) At Plaintiff's follow up with Dr. Dillon on May 9, 2013, Plaintiff's blood pressure was a little high at 152/98 so Dr. Dillon readjusted Plaintiff's blood pressure medication. (R. 420–22.) Notably, even Dr. Dillon opined that with normal activity, Plaintiff does reasonably well. (R. 412.)

Following Dr. Dillon's May 6, 2011 opinion regarding permanent disability, nothing else in Plaintiff's medical records lend support to the conclusion that Plaintiff will likely be permanently disabled. Plaintiff's medical records disclose that Plaintiff's occasionally high blood pressure is controlled with blood pressure medication and adjusted when necessary. *See Vuxta*, 194 F. App'x at 877 (later medical records that indicate significant improvement with treatment support disregarding a physician's opinion). Even Dr. Dillon opined that when Plaintiff engages in normal activity he does well and Dr. Dillon encouraged Plainitff to increase his walking. Thus, Dr. Dillon's opinion regarding permanent disability appears to be contradictory to the medical evidence, and his own opinions, that followed.  Consistent with *Winschel*, 631 F.3d at

1179, the ALJ had good cause for disregarding Dr. Dillon's opinion because Plaintiff's later medical evidence supported a contrary finding and because Dr. Dillon's opinion was inconsistent with his own medical records. Accordingly, the ALJ did not err when he decided not to give weight to Dr. Dillon's conclusory opinion.

Accordingly, the Court concludes that the ALJ did not err in finding that Plaintiff did not meet the requirements of Listing 4.02 because Plaintiff failed to demonstrate that he meets or equals all of the Listing 4.02 criteria. Further, the Court concludes that the ALJ did not err when he gave no weight to Dr. Dillon's opinion because Plaintiff's medical records supported a contrary finding and Dr. Dillon's opinion was inconsistent with his own medical records.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 6th day of November, 2015.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**